## UNITED STATES DISTRICT COURT

## DISTRICT OF NEW MEXICO

**ALFONSO PEDRAZA**,

      Petitioner,

vs.

                                                                                                                No. CIV 6:96-737 SC/LCS

**UNITED STATES OF AMERICA**,

      Respondent.

## MAGISTRATE JUDGE'S PROPOSED FINDINGS

## AND RECOMMENDED DISPOSITION

### Notice

Within ten days after receiving a copy of the Magistrate Judge's Proposed Findings and Recommended Disposition a party may, pursuant to 28 U.S.C. Sec. 636(b)(1), file written objections. A party must file any objections within the ten day period if the party desires review by the district court. In the absence of timely filed objections, no review will be undertaken.

Petitioner Alfonso Pedraza ("Pedraza") was convicted of conspiracy to possess with intent to distribute more than five kilograms of cocaine in violation of 21 U.S.C. Sec. 846, and received a 30 year sentence. After exhausting his appeals, he filed a motion to vacate and set aside sentence pursuant to 28 U.S.C. Sec. 2255, raising 15 claims of ineffective assistance of counsel and one claim that he failed to receive a fair trial. Pursuant to 28 U.S.C. Sec. 636, this case was referred to a United States Magistrate Judge to make findings and recommend a final disposition. On May 5, 1998 the Court conducted an evidentiary hearing on the claims.

**Facts**

Edward Mitchell ("Mitchell") and George Anthony Seek ("Seek") were acquainted since the seventies. While incarcerated together on unrelated drug charges at La Tuna Federal Penitentiary in the early eighties, they discussed engaging in drug smuggling operations upon their release from prison. On November 25, 1988, Mitchell, who had escaped from a halfway house and was a fugitive living in Colombia, returned a telephone call to Seek, who had been released from prison and was living in New Mexico. Mitchell told Seek that he was arranging a deal to import a large amount of marijuana into the United States, and asked if Seek wanted in on the deal. Seek agreed.

Unbeknownst to Mitchell, Seek was working as an informant for the United States Customs Service in exchange for the government's recommendation that he receive probation on a drug charge. At Seek's request, Mitchell agreed to smuggle cocaine instead of marijuana. On September 20, 1989, Mitchell gave Seek Alfonso Pedraza's ("Pedraza") Miami phone number, telling Seek to speak with him about expense money for the deal. Mitchell also told Seek that Pedraza's brother Enrique, another fugitive living in Colombia, was involved in the cocaine smuggling plan.

Seek called Pedraza on November 11, 1989 about expense money. On November 17, 1989, Pedraza called Seek to tell him that Mitchell's money source had contacted Pedraza and would meet with him in Orlando. Seek gave Pedraza specific instructions on how to ship the expense money. Pedraza picked up the money and shipped $20,000 in currency to Seek from Tampa Bay to Albuquerque via Trans World Airlines. Shortly afterwards, Seek told Pedraza that another $5,000 was needed.

On November 20, 1989, Pedraza called Seek and scheduled a meeting at a restaurant in Miami. Pedraza gave Seek the extra $5,000 he requested at this meeting. On November 21, 1989, Seek notified Mitchell that he was flying from Florida to Colombia to get the cocaine, which was to be smuggled into Florida. However, because Customs was unable to get clearance through Colombian authorities, Seek called Enrique and told him the aircraft had been seized and additional funds were needed to obtain another aircraft. On December 13, 1989, Enrique told Seek that Pedraza was attempting to arrange another drug deal to raise money to pay for the transportation of the cocaine. On January 20, 1990, Mitchell was arrested by Colombian authorities. On February 6, 1990, Pedraza was arrested by Florida state officials on unrelated drug charges.

Following Pedraza's arrest, his brother Nelson and brother in law Irelan became involved in the conspiracy. Irelan told Seek that he would arrange to get another $30,000 in expense money. In March 1990, the cocaine owners agreed to provide the expense money. Enrique told Seek that the $30,000 could be picked up in California; Seek retrieved the money. On March 14, 1990, Irelan sent $5,000 to Seek in New Mexico.

In April, 1990, Enrique and Seek conceived a new plan for smuggling the cocaine into the United States, by flying it into New Mexico. On May 11, 1990 Irelan provided another $5,000 in expense money for the deal. On June 13, 1990 Customs agents posing as Colombian drug couriers delivered approximately 700 kilograms of cocaine to Enrique and Jamie Martinez, who then transferred it first to a boat, then to a seaplane which flew Seek, Enrique, Martinez and the cocaine to an undercover airstrip in New Mexico. There they met Irelan and another brother, Nelson. Enrique made arrangements to obtain money to pay Seek for transporting the cocaine. On

June 17, 1990, Nelson and Seek flew to California and received $400,000 from Jairo Salazar. Five days later, Customs agents arrested Enrique, Irelan, Martinez and Nelson. Martinez was turned over to the Immigration and Naturalization Service and deported. On July 4, 1990, Salazar was arrested in Miami.

Following the arrests, the Customs Service held a press conference where it displayed the cocaine and money that had been confiscated upon Defendants' arrest. Following the press conference, the Select Committee of the United States House of Representatives conducted an investigation into the arrests, and Chairman Charles Rangel and Representative Bill Richardson issued a joint statement criticizing the Customs Service for misstating the facts surrounding the investigation and for failing to inform the public that government agencies had orchestrated the bust from the beginning.

On July 11, 1990 a federal grand jury indicted Pedraza, along with Enrique, Irelan, Nelson, Salazar and Mitchell for conspiracy to possess with intent to distribute more than five kilograms of cocaine, and for possession with intent to distribute more than five kilograms of cocaine. Nelson and Salazar entered plea agreements and the charges against Mitchell were dismissed. On March 7, 1991 Mitchell was sentenced to thirty years imprisonment by the United States District Court for the District of Wisconsin on a separate drug charge.

The three remaining defendants were tried jointly before a jury beginning on October 15, 1991. At the close of the government's case, the court granted judgments of acquittal on the possession charge as to Pedraza and Irelan. The Defendants then moved to dismiss the remaining counts on the grounds of outrageous governmental conduct, but the court denied their motion. On November 15, 1991, the jury found all three defendants guilty on the remaining counts. The

court sentenced Pedraza to 30 years imprisonment, Enrique to 32 years, and Irelan to 20 years. All three defendants appealed, but their convictions were upheld. *See United States v. Pedraza et al.*, 27 F.3d 1515 (10th Cir. 1994). On May 29, 1996, Pedraza moved to vacate or correct his sentence pursuant to 28 U.S.C. Sec. 2255, alleging that because he did not receive a complete trial transcript, he did not receive a fair trial or a fair appeal. He also alleged that he received ineffective assistance of counsel at trial.

## Proposed Findings

Pedraza first contends that he received ineffective assistance of counsel. Under *Strickland v.. Washington*, 466 U.S. 668, 692-694 (1984), an ineffective assistance of counsel claim requires an appellant to establish two elements: first, he must show that Counsel's conduct was outside the wide range of professionally competent assistance, (the "objectively unreasonable" test), and second, he must establish a reasonable probability that had the attorney's performance been adequate, the outcome would have been different (the "prejudice" test).*Id.*

Pedraza's first two claims are that his trial counsel should have moved for severance of his case either before trial, or during trial, after exculpatory testimony had been presented. At the evidentiary hearing, Pedraza testified that his attorney told him that she would not file a motion to sever because it was likely to be denied. Transcript of Evidentiary Hearing of May 5, 1998 ("Transcript") at 171-172. His trial counsel testified that she failed move to sever because she felt his lack of involvement in the conspiracy would be more apparent to the jury if he were compared to the more culpable conspirators. Transcript at 73-75. Pedraza contends that this explanation is "incoherent", that there was a reasonable probability that the motion would have been granted, and, if it had, the outcome may well have been different. See Memorandum Brief in

Support of 2255 Petition for Writ of Habeas Corpus ("Memorandum") at 10-12.

This claim fails because Pedraza never explains how counsel's tactical decision not to move to sever (either to save time if the motion had scant chance of success, or to highlight the differences between Pedraza and his co-defendants) fell outside the wide range of professionally competent assistance. There is a strong presumption that attorneys' strategic choices are sound, *Strickland*, supra. Accordingly, that tactical decisions that are not objectively unreasonable do not constitute ineffective assistance of counsel. *Hensley v. Crist,* 67 F.3d 181, 185 (9th Cir.1995 ). In addition, because the District Court has already determined that Pedraza was not prejudiced by the failure to sever his case, *see* Dec. 6, 1996 Order adopting Magistrate Judge's Report and Recommendation, he is barred from arguing it now. *See Mancuso v. United States*, 464 F.2d 1273, 1275 (10th Cir. 1972). Accordingly, I propose finding that Pedraza's first two claims establish neither the objective unreasonableness nor the prejudice prongs of the *Strickland* test.

Pedraza's third claim is that his counsel should not have stipulated to the admissibility of 30 taped telephone recordings and transcripts.  He claims that counsel should have objected to their admission because of material discrepancies.  Memorandum at 13.  However, Pedraza never explains how the discrepancies prejudiced his case. Accordingly, I propose finding that the allegations supporting his third claim fails to establish the second prong of the *Strickland* test.

Pedraza's fourth claim is that his counsel failed to cross examine co-conspirator Irelan who testified that he told the informant Seek that "the cocaine operation would start up again upon Pedraza's release from jail." Memorandum at 13-14.Pedraza claims that Irelan was actually talking about Pedraza's brother Enrique, not the Petitioner, but the jury was left with the impression that Irelan was referring to Petitioner.

6

This claim fails because such confusion would not, in fact, have prejudiced Petitioner. Since Pedraza never was released from jail, the jury could just as easily have drawn the conclusion that the original cocaine operation never started up again; accordingly, a new and separate conspiracy would have had to begin, this time without Pedraza's participation.  As this was the precise theory of his defense at trial, the ambiguity should actually have helped Petitioner.  In addition, since the confusion could have helped Pedraza establish his separate conspiracy defense, his counsel's failure to cross-examine Irelan on this point would not be objectively unreasonable. I therefore propose finding that Pedraza's allegations fail to establish either the objective unreasonableness or the prejudice prongs of the *Strickland* test.

Pedraza's fifth claim begins by alleging that the informant's failure to record the telephone calls he made to Columbia between November 25, 1988 to September, 1989 prejudiced Petitioner's defense.  He contends that calls made during this time period were crucial because "it was when Alfonso was arrested and his continued involvement in the conspiracy was at issue." Memorandum at 15.  This claim is not credible, since in the same paragraph Pedraza contends that "his involvement began in November 1989 and ended no later than Feb. 6, 1990."

Pedraza then contends that:

> There also was an eighteen day gap in recordings from January 20 to Feb. 8, 1990 which the government never fully explained.  There is sufficient evidence that the government either failed to turn over "missing tapes" or that it destroyed them in bad faith.  Trial counsel should have investigated and prepared for the introduction of the tape recordings before trial... There is a reasonable probability that, had the missing tapes been available, the testimony could have affected the judgment of the trier of fact." *Id.*

There are two problems with this argument.  First, contrary to Pedraza's assertion, the Court of

Appeals specifically found that there was *not* sufficient evidence that the government either failed to turn over "missing tapes", or that it destroyed them in bad faith. *United States v. Pedraza et al.,* 27 F.3d 1515, 1527 (10th Cir. 1994). This argument is therefore barred under the law of the case doctrine, *see Bromley v. Crisp*, 561 F.2d 1351, 1363 (10th Cir. 1977) and it cannot be used to imply that counsel's failure to investigate was objectively unreasonable. In addition, without knowing whether tapes of phone calls between January 20, 1990 to February 8, 1990 even exist at all, much less the content of the conversations they allegedly would have recorded, it is impossible as a matter of logic to conclude that there is a reasonable probability that, had the tapes been produced, the jury would have reached a different result. As such, Pedraza's argument also fails to establish prejudice. I accordingly propose finding that Pedraza's fifth claim establishes neither prong of the *Strickland* test.

Petitioner's sixth claim is that his counsel should not have stipulated to the admission of the guilty plea statements of two other co-conspirators, his brother Nelson Pedraza and Jairo Salazar, as well as the thirty tapes mentioned in his third claim, to prove the time limits, members and objective of the conspiracy. Instead, he argues that counsel should have insisted that the government provide independent evidence of the conspiracy before moving the plea statements and tapes into evidence. Pedraza's argument relies on the implicit premise that the government did not have such independent evidence. However, his trial counsel testified that after receiving voluminous discovery from the government pursuant to court order, she was certain that the prosecution had sufficient independent evidence to establish the conspiracy. Transcript at 89-93. While counsel could have forced the government to establish the foundation and hoped that it made a mistake, the experience of the U.S. attorneys involved with the prosecution, as well as

trial counsel's desire not to antagonize the trial judge, establish that her agreement to stipulate to the admissibility of the tapes was not objectively unreasonable. I accordingly propose finding that the allegations in Pedraza's sixth claim fail to establish the first prong of the *Strickland* test.

      Pedraza's seventh, eighth and twelfth claims are that trial counsel was ineffective for failing to produce and or cross-examine co-conspirators Salazar-Trujillo, Mitchell and Martinez in order to establish the limited extent of Pedraza's involvement in the conspiracy. Memorandum at 17-18, 23.  At the evidentiary hearing, counsel explained that she did not cross-examine Salazar because his failure to mention Pedraza's name during direct examination allowed her to argue to the jury the implication that the two had never met.  Because she was unable to interview Salazar, she was not sure if Salazar's testimony would be consistent with this implication, so she decided not to cross-examine him. Transcript at 115-116 and 129. Refraining from asking questions to which counsel doesn't know the answer is not objectively unreasonable.  Counsel also explained that she did not subpoena Mitchell because she was informed by his counsel that he would invoke his fifth amendment privilege against self-incrimination. Transcript at 125-128 and 133.  Her conduct in this instance is also not objectively unreasonable. Finally, counsel explained that she could not subpoena Martinez because he had been deported immediately after his arrest, and that she filed a motion to dismiss based upon, *inter alia,* this instance of governmental misconduct. Transcript at 116-117. This, too, is not objectively unreasonable. I accordingly propose finding that the allegations in Pedraza's seventh, eighth and twelfth claims fail to establish the first prong of the *Strickland* test.

      Pedraza's ninth and tenth claims are that trial counsel failed to aggressively pursue his defense by either objecting to, or cross-examining on, two inaccurate statements; one that seemed

to erroneously tie him to the conspiracy in September of 1989, rather than November 1989, and one that implied that he was providing money to fund the conspiracy, rather than just acting as a courier.  Memorandum at 18-20.  This claim fails because Pedraza never explains why the more aggressive response would have created a reasonable probability that the result would have been different.  Pedraza's defense, then and now, is that the conspiracy in which he was involved ended upon his incarceration in January of 1990.  Memorandum at 16-17; Transcript at 33 and 133. There is no reason why alleged errors as to the beginning date or as to the extent of his involvement prior to the termination of the conspiracy would weaken this defense. Accordingly, even had they been corrected, there is not a reasonable probability that the jury's verdict would have been different.    In addition, Pedraza fails to cite any evidence that the jury actually was confused on either point.  Trial counsel testified that the jury saw ample evidence that Petitioner was far too poor to be funding international cocaine smuggling. Transcript at 82-83. I therefore propose finding that neither the allegations in Pedraza's ninth nor in his tenth claims establishes the second prong of the *Strickland* test.

Pedraza's eleventh claim is that his trial counsel should have requested an instruction that the jury not consider his brother Nelson's and another co-conspirator, Salazar's guilty pleas as evidence of Petitioner's guilt. Memorandum at 20-22.  Generally, the court should give such an instruction even if it is not requested by the co-defendants. *See United States v. Austin,* 786 F.2d 986, 991 (10th Cir. 1986).  When asked by the Court why she failed to ask the trial court to give such an instruction in this case, trial counsel said that because neither plea statement mentioned Pedraza, she did not feel they were by themselves harmful to his defense, that the plea statements themselves were thoroughly explored on cross-examination by counsel for the co-defendants and

10

that, although she considered the possibility that the jury might believe Pedraza guilty simply by virtue of his familial ties to some of the co-conspirators, she felt the best trial strategy was not to draw attention to her client, but rather to wait until the end of the trial and show how little evidence tied her client to the conspiracy. Transcript at 120-125. She testified: "One of my theories on the trial was that I did not want to push [Pedraza's] presence into anything -- any place where it didn't have to be." *Id.* at 121.  As this strategy is not objectively unreasonable, I propose finding that Pedraza's eleventh claim fails to establish the first prong of the *Strickland* test.

      Pedraza's thirteenth claim is that his counsel should have called several witnesses that would have helped bolstered his defense that he was involved in an earlier conspiracy that terminated, because of his incarceration, prior to the initiation of the conspiracy for which he was eventually prosecuted, and that he had no involvement in the latter conspiracy.  He claims that her approach of limiting her presentation of his defense to the occasional cross-examination of the government's witnesses was ineffectiveness of constitutional dimension. Memorandum at 23-27.

      While his suggestions of how his defense might have been improved appear reasonable in hindsight, the purpose of habeas corpus review is not to engage in Monday morning quarter backing about trial counsel's tactics; it is instead to see if her performance falls below objective standards of reasonableness.  Given that she thought her best defense was actually outrageous government conduct, and that Pedraza's co-conspirators' counsel, by necessity,  put on a  more aggressive defense, her strategy of minimizing her client's visibility during trial does not appear objectively unreasonable.  Accordingly, I propose finding that the allegations in Pedraza's thirteenth claim fail to meet the first prong of the *Strickland* analysis.

Pedraza's fourteenth claim is that his counsel should have objected to the admission of a letter from a DEA agent to the government informant Seek's probation officer detailing Seek's assistance in three large cocaine busts, including the one underlying the conspiracy prosecution. Memorandum at 27-28. Petitioner claims that the letter had no probative value and was introduced only to bolster the informant Seek's credibility. *Id.* Pedraza does not acknowledge that, if Seek's credibility were in issue, the letter would have probative value and would be admissible. Further, Pedraza does not explain how or why the informant's credibility affected his defense. As Pedraza has not alleged any inconsistency between Seek's testimony and his theory of defense, his argument does not establish a reasonable probability that had the letter not been admitted, the result in the trial would have been different. Accordingly, I propose finding that the allegations in Pedraza's fourteenth claim fail to meet the second prong of the *Strickland* test.

Pedraza's fifteenth claim is that his counsel should have demanded that he be present at a conference that ensued when the jury, during deliberations, requested transcripts of telephone conversations from November, 1989 to February 1990. As these were the times that Pedraza admitted he was involved in a conspiracy, it is probable that the jury was discussing his culpability. At the conference, the prosecution and defense agreed, inexplicably, to give the jury all of the exhibits, one of which, a telephone log, contained a major error. The log attributed an April 3, 1990 conversation between the government informant Seek and the Petitioner's brother Enrique to the government informant and the Petitioner. Memorandum at 28. The error could well have prejudiced Pedraza's case, as it undermined the credibility of his defense that he had no involvement with the conspirators after February 6, 1990.

While there may well be a reasonable probability that, but for the jury's receiving this

exhibit, the jury verdict might have been different, the actual question is whether, had Pedraza been allowed to attend the meeting, it was likely that they would nave corrected the error in the exhibit before the jury received it.  On this question, Pedraza's claim fails.  First, there is no indication that Pedraza or his counsel would have checked the accuracy of exhibits that had already been admitted at trial, especially since counsel had decided to give the jury all of the exhibits, and the parties would have not had time to examine them.  Second, even had they discovered the error, there is no guarantee that the court would not have ruled that Pedraza had waived his objections by not raising them at the time the log was admitted.  Therefore, although trial counsel's failure to discover the error might well have prejudiced petitioner, her failure to demand that he be present at the meeting did not.  Accordingly, I propose finding that the allegations in Pedraza's fifteenth claim do not establish the second prong of the *Strickland* test.

Pedraza's sixteenth and final claim is that he was denied a fair trial and complete appeal due to the incompleteness of the trial transcripts and record on appeal. He contends that his copy of the trial transcript was missing 46 pages, and that the taped conversations played in open court were not transcribed.  Memorandum at 28-29.  Pedraza does not explain how his failure to receive a complete transcript after the trial was completed could have affected the trial itself, so his claim will be analyzed as a claim that the failure to provide a complete transcript prejudiced his ability to raise a denial of a fair trial claim on appeal.

Generally, the mere absence of a perfect transcript does not, by itself, constitute a constitutional violation unless the defects have precluded petitioner from asserting an alleged constitutional violation in his trial.  *Mitchell v. Warwick*, 536 F.Supp. 395, 402 (E.D. Mo. 1982).  Pedraza has not claimed any such preclusion.  Accordingly, Pedraza must show actual prejudice

13

resulting from the incompleteness of the transcript. *United States v. Renton*, 700 F.2d 154, 157(5th Cir. 1983). Pedraza points out which pages were missing, but fails to show why his appeal was prejudiced. Accordingly, I propose finding that Pedraza's final claim fails to meet the Actual prejudice test required under *Renton.*

**Recommended Disposition**

Because none of Pedraza's first fifteen claims establishes both prongs of the *Strickland* test for ineffective assistance of counsel, and because his final claim does not establish that he was denied either a fair trial or a fair appeal, I recommend that his Motion to Vacate or Correct Illegal Sentence be **DENIED.**

_____
Leslie C. Smith
United States Magistrate Judge